# IN THE COURT OF APPEALS OF THE STATE OF MISSISSIPPI

## NO. 2021-KA-01104-COA

**JESSE SMITH A/K/A JESSE SCOTT SMITH**                    **APPELLANT**

**v.**

**STATE OF MISSISSIPPI**                                       **APPELLEE**

DATE OF JUDGMENT:                 07/22/2021
TRIAL JUDGE:                      HON. DAVID H. STRONG JR.
COURT FROM WHICH APPEALED:        LINCOLN COUNTY CIRCUIT COURT
ATTORNEY FOR APPELLANT:           OFFICE OF STATE PUBLIC DEFENDER
                                  BY: GEORGE T. HOLMES
ATTORNEY FOR APPELLEE:            OFFICE OF THE ATTORNEY GENERAL
                                  BY: CASEY BONNER FARMER
DISTRICT ATTORNEY:                DEE BATES
NATURE OF THE CASE:               CRIMINAL - FELONY
DISPOSITION:                      AFFIRMED - 12/13/2022
MOTION FOR REHEARING FILED:

**BEFORE BARNES, C.J., McDONALD AND McCARTY, JJ.**

**McCARTY, J., FOR THE COURT:**

¶1.    A man was indicted for one count of first-degree murder after fatally shooting his friend in the head. Before trial, his retained firearms expert was excluded by the trial court. The jury found him guilty, and he timely appealed. Finding that it was error to exclude the entirety of the expert's testimony, but that the error was harmless, we affirm.

## FACTS

¶2.    Leon Bennett was working near his son John's house when all of a sudden he heard his wife screaming. She had just discovered their son's body in the house. Leon ran inside and saw their son on the floor—dead. Their son's phone was lying near his body, still

playing music.

¶3.    After looking around John's house, Leon did not see a gun.  But Leon would later testify he had seen a gun at the house two days earlier.  A friend of his son, Jesse Smith, had shown him a .22 pistol.

### The Night Before

¶4.    Elizabeth Peets Bowlin and the victim were "good friends."  She brought her two-year-old daughter with her to John's house the night he was shot.  Jesse Smith was at the house as well.  Elizabeth put her daughter to bed in John's bedroom, and according to her, the trio just sat in the living room listening to music.  Even though she said no one was using drugs, the authorities would later find drugs and drug paraphernalia in John's house.

¶5.    At some point during the evening, Smith left the living room and went into the kitchen.  Elizabeth testified that Smith walked back out of the kitchen, and without warning, shot John in the head with a pistol.

¶6.    Shocked, she asked Smith, "Why are y'all doing this to me, is this a joke?"  Elizabeth said she thought it might be since the music was still playing, and the gunfire wasn't loud.

¶7.    In response, Smith said to her, "This is a .22, b****.  You think I'm joking?"

¶8.    He then bent over and shot John in the head a second time.

¶9.    Elizabeth then told Smith they needed to call 911, and Smith replied, "You're not calling anybody.  You and your daughter are next if you don't do what I say."

¶10.   She testified that after his threat, "I did what he said."  Smith told her to get her daughter and things because "[w]e have to leave now."

2

¶11. Elizabeth testified at that point she thought Smith was going to kill her and her daughter. "I was in shock really. I didn't know what to do." They left the house; at first, Smith was riding his motorcycle and Elizabeth followed him separately in her own car. When later asked why she didn't just stop following him, she replied, "Because my daughter was in the car. I didn't know where I was and he had a gun and I didn't want him to try to shoot my car and kill my daughter." Then, Elizabeth picked Smith up, and he rode with her and her daughter.

¶12. When asked where they went, she replied, "We rode around forever. And he kept telling me all of these crazy reasons about why he did what he did." She went on, "And then we ended up at some people's houses he knows." Elizabeth testified Smith was acting "[c]razy out of his mind."

¶13. They ended up in Bogue Chitto at the home of some of Smith's friends—Mike and Amber Domanick. Mike would later tell investigators that Smith was "talking in circles" and about random things that did not make sense. He took Smith off to run some errands, while Elizabeth and her child stayed with Amber. While the men were gone, they stopped at a portable building location owned by Mike's family.

¶14. By the time they returned to Mike's house, it was mid-afternoon, and Elizabeth was about to leave. At some point in the evening, Mike got on Facebook and saw Smith was "wanted for questioning" from the police department. Mike told Smith to leave, and then "immediately called the law."

¶15. Elizabeth remembers being at the Domanicks' house for "a long time." She testified

3

that Smith "was acting like he was coming down from whatever he was doing and not acting as sporadic and crazy, and that's when he finally agreed to let me leave." Once she left, she told her parents what happened. Her parents took her to their pastor, who called the police and relayed the events that had unfolded.

### *The Investigation*

¶16. A detective arrived at the victim's house and discovered John lying in a pool of blood. He would later testify there were drugs and paraphernalia like pipes and possibly methamphetamine in the house. A spent .22 shell casing was found, with a second discovered later by the crime scene cleanup crew.

¶17. Detective Clint Earls personally interviewed Smith. He described him as "nervous" and "anxious" and said he couldn't sit still. Earls testified that Smith "was basically in the self-preservation mode. He didn't deny that he was at the scene; however, he left a lot of facts out that had to be directly asked." Also Smith "didn't volunteer any information. And he made contradictory statements as to whether he owned certain items or where certain items were located."

¶18. Smith admitted to Detective Earls that he was at John's house the night of his murder, but insisted John was alive when he left his house. When Earls asked Smith where he went after he left the victim's house, Smith said he was going with a woman named Elizabeth who he had met at John's house that night, hoping to "hook up" with her.

¶19. Detective Earls asked Smith what caliber weapons he owned, as Smith admitted to owning guns. Earls directly asked Smith whether or not he owned a .22 caliber handgun; he

4

said yes. He asked where it was, and according to the detective, Smith "went back into that nervous and defensive posture of turning away from me," at first telling Earls "that the firearm possibly could be stolen."

¶20. But Smith then admitted he knew where the gun was. He agreed to take Earls to it. They drove together to where Smith had hidden the gun—thrown underneath a portable building where Mike had taken Smith.

¶21. Smith was arrested and subsequently indicted for the first-degree murder of John Bennett.

## PROCEDURAL HISTORY

¶22. Before trial, Smith sought to admit Steven Howard as an expert in firearms. The State opposed allowing Howard to testify, and prior to trial, a *Daubert* hearing was held.

¶23. Howard explained he had an associate arts and science degree in gunsmithing and "over half a century of gunsmithing experience." He stated, "I've basically been a gunsmith my whole life." When asked what skills he had in the area of gunsmithing, he replied he was "basically, a master gunsmith" and that he could "do everything from precision mills and lathes to roll weld blacksmith barrels as they did in the 1700's."

¶24. Howard had personally tested the .22 pistol recovered by law enforcement from the portable building. According to his measurements, obtained with trigger pull gauges, he determined the handgun had a 2.25 pound trigger pull. In his view, this meant the pistol had a "dangerously light" trigger pull.

¶25. Howard thought the light trigger pull meant the pistol "*could* have discharged twice

5

in quick succession." (Emphasis added). But within his report was a more pointed statement, and one seemingly outside the range of training in firearms: "I can say with a strong scientific certainty that the 2 shots . . . were fired in a very quick succession."

¶26. The State honed in on this conclusion. To some extent it questioned whether Howard possessed sufficient qualifications as an expert, but the chief attack was that the proffered expert's testimony was simply unreliable.

¶27. Specifically, the State argued Howard's theory that the two bullets were fired in quick succession was not founded on "any scientific methodology . . . other than 'that is what he has seen in the textbooks that he has read over the years.'" The State argued Howard "could provide no explanation as to how his experience and experimentation as a gunsmith would qualify him to form an opinion to a reasonable degree of scientific certainty that two bullets fired into the head" of the victim could have been fired "simultaneously."

¶28. The trial court later ruled Howard would not be allowed to testify as an expert witness, finding "Mr. Howard is hereby disqualified under the standards established in *Daubert*, to testify as an Expert in the Field of Firearms and Ballistics."

¶29. Counsel for Smith immediately filed a petition for interlocutory review with the Supreme Court, claiming that "[t]o exclude Mr. Howard as an expert in the murder case is a violation of Petitioner's due process rights to a fair trial." The Supreme Court declined to accept the case for interlocutory review, and the case went to trial.

¶30. During the proceedings, it became clear that a theory of the defense was that the victim had not been shot by Jesse Smith, but instead had committed suicide. Defense counsel

6

inquired of the victim's father whether John had previously made an attempt at self-harm, and his father said he had. The attempt had resulted in John being hospitalized for four days. The father also testified his son had struggled with depression. Multiple other witnesses were asked if they knew whether the victim had harmed himself before, or if he was suicidal.

¶31. This line of questioning found no purchase with the State's forensic pathology expert, Dr. Mark LeVaughn. He admitted finding Xanax, methamphetamine, and "THC marijuana" in the victim's blood.

¶32. But when asked by defense counsel if it was possible that John had committed suicide, the expert testified, "In my opinion the manner of death could not be suicide." The forensic pathologist remained steadfast that "the cause of death of John Bennett is multiple gunshot wounds to the head, and in my opinion the manner of death . . . is homicide."

¶33. This was because the victim was shot two times in the head. According to the doctor, "each of these wounds in itself . . . would be classified as instantly incapacitating and basically instantly lethal."

¶34. The State also called forensic scientist Lori Beall, who testified as an expert in firearms identification and ballistics. She testified that her duties as a forensic scientist included examining evidence to determine if a particular cartridge case, projectile, or other ammunition component was fired in a specific firearm. She stated she did specialized testing on the handgun in question, comparing it to the shell casings that were found at the scene of the crime.

¶35. Based off her tests, she determined the shell casings came from a .22 caliber pistol.

7

She did note the "projectiles were extensively mutilated" and "there was not sufficient individual characteristics to identify them as being fired in this firearm[.]" But despite this, she concluded that the shell casings recovered at the scene came directly from Smith's gun.

¶36. While she declined to provide an "exact measurement," Beall stated that the .22 did not at first fire at two pounds of trigger pull pressure, but did fire at 2.25 pounds—the same calculation reached by the defendant's rejected expert.

¶37. Smith was found guilty and sentenced to life in prison. He timely appealed.

## DISCUSSION

¶38. Smith argues two points. The first contends it was error to exclude his proffered expert in firearms. Second, he argues the jury verdict was contrary to the weight of the evidence. We address each issue below.

### I.    It was harmless error to exclude part of Smith's proposed expert witness's testimony.

¶39. Smith argues the trial court's wholesale exclusion of Howard as an expert witness was "prejudicial to the defense." Smith further contends that "Howard was abundantly qualified, and his testimony would have been relevant and reliable and helpful to the jury's consideration of [Smith's] defenses," and further admissible "regarding gunsmithing, silencers, trigger pull standards, powder stippling, soot, and investigation reconstruction."

¶40. "When reviewing a trial court's decision to allow or disallow evidence, including expert testimony, we apply an abuse of discretion standard." *Illinois Cent. R. Co. v. Brent*, 133 So. 3d 760, 779 (¶44) (Miss. 2013). "Unless this Court concludes that a trial court's decision to admit or exclude evidence was arbitrary and clearly erroneous, that decision will

8

stand." *Id.*

¶41. Mississippi Rule of Evidence 702 guides our analysis for admitting expert testimony. In order to testify in regard to scientific, technical, or other specialized matters, a witness has to first be qualified as an expert to do so. MRE 702. The expert's knowledge must be able to assist the "trier of fact to understand the evidence or to determine a fact in issue[.]" MRE 702(a). The testimony must be "based on sufficient facts or data" and "the product of reliable principles and methods," and "the expert [must have] reliably applied the principles and methods to the facts of the case." MRE 702(b)-(d). Additionally, Mississippi has adopted the United States Supreme Court's standard for determining the admissibility of expert testimony. *Brent*, 133 So. 3d at 781 (¶50) (citing *Daubert v. Merrell Dow Pharms. Inc.*, 509 U.S. 579 (1993)).

¶42. As a core consideration, "[e]xpert testimony must be relevant and reliable to be admissible." *Id.* In determining whether expert testimony is reliable, this Court may consider:

> (1) whether the theory or technique can be and has been tested; (2) whether it has been subjected to peer review and publication; (3) whether, in respect to a particular technique, there is a high known or potential rate of error; (4) whether there are standards controlling the technique's operation; and (5) whether the theory or technique enjoys general acceptance in the relevant scientific community.

*Id.* (citing *Miss. Transp. Comm'n v. McLemore*, 863 So. 2d 31, 37 (¶13) (Miss. 2003)). And evidence is relevant if it has "any tendency to make a fact more or less probable than it would be without the evidence" and if "the fact is of consequence in determining the case." MRE 401. "The applicability of these factors depends on the nature of the issue, the expert's

9

particular expertise, and the subject of the testimony." *McLemore*, 863 So. 2d at 37 (¶13).

¶43. "Depending on the circumstances of the particular case, many factors may be relevant in determining reliability, and the *Daubert* analysis is a flexible one." *Id*. at 38 (¶16). "*Daubert* provides an illustrative, but not an exhaustive, list of factors that trial courts may use in assessing the reliability of expert testimony." *Id*. (internal quotation marks omitted).

¶44. First, we must determine whether Howard was qualified to testify in his capacity as a gunsmith. Howard has an associate degree in gunsmithing and over 50 years of gunsmithing experience. He represented he could "do everything from use precision mills and lathes to roll weld blacksmith barrels as they did in the 1700's." Howard said he had been an expert in multiple jurisdictions. He coined himself "a master gunsmith."

¶45. Given this deep background in guns, Howard had "scientific, technical, or other specialized knowledge" to "help the trier of fact to understand the evidence or to determine a fact in issue." MRE 702(a).

¶46. Next, we must determine whether the proffered testimony was reliable. "Because the application of the modified *Daubert* rule is fact-specific, a review of [Howard's] trial testimony is necessary for our analysis." *McLemore*, 863 So. 2d at 40 (¶28).

¶47. There are two areas of reliability we must assess from Howard's expert report and proffered testimony. Howard personally tested and calculated the trigger pull of the .22 caliber pistol. The results he achieved were later corroborated by the State's expert. Howard further opined on the speed with which the two shots were fired—claiming he could somehow tell "the two shots . . . were fired in a very quick succession."

¶48. Howard took the actual .22 recovered in this case to a range and then tested it extensively. He employed two different types of trigger pull gauges to determine the gun fired at a 2.25 pound trigger pull. *See* MRE 703 (stating that "[a]n expert may base an opinion on facts or data in the case that the expert has been made aware of or personally observed").

¶49. Given his qualifications as a person who crafts guns, combined with an associate degree in gunsmithing, we find that Howard's conclusion regarding the trigger pull of the pistol was reliable. This conclusion is further supported by the fact that Beall, the State's ballistics expert, reached the same conclusion that the gun would fire at 2.25 pounds of pressure on the trigger after testing. Because this testimony was relevant and reliable, as well as based on personal observation, Howard was qualified to testify as an expert witness regarding the trigger pull.

¶50. But that was not the only conclusion Howard reached. Our second focus is his untested second theory that the pistol could have been fired twice in quick succession, and whether it was relevant and reliable under the facts of this case. In his expert report, Howard opined "with strong scientific certainty that the 2 shots . . . were fired in a very quick succession."[1] He concluded that the gun was "completely unsafe" and "given the unsafe

---

[1] While we have the transcript of the *Daubert* hearing, Howard's report is not in the record, which impedes this Court's ability to review this assignment of error. "[I]f the appellant intends to urge on appeal that a finding or conclusion is unsupported by the evidence or is contrary to the evidence, the appellant *shall* include in the record a transcript of all evidence relevant to such finding or conclusion." MRAP 10(b)(2) (emphasis added). The failure to include the report hinders our review of whether Howard was improperly excluded, as the report contained a record of the testimony he was prepared to offer.

nature of the pistol in question, it could have discharged twice in quick succession."

¶51.    Yet this conclusion was not based upon reliable methods or testing based upon the actual facts of the case.  In its brief in the trial court opposing Howard's testimony, the State argued "that he could provide no explanation as to how his experience and experimentation as a gunsmith would qualify him" to suggest the victim could have theoretically shot himself in the head twice in quick succession.

¶52.    The State argued this testimony echoed that rejected by our Supreme Court in *Edmonds v. State*, 955 So. 2d 787, 791 (¶6) (Miss. 2007).  There, the State's expert witness advanced a theory that the wounds on the body of a victim were "consistent with two people involved," and that he thought it was "less likely" it was only one person who had fired the gun.  *Id*. at (¶7) (emphasis omitted).  Defense counsel "argu[ed] that such testimony was beyond [the expert's] area of expertise," but the trial court declined to exclude it.  *Id*. at 792 (¶7).

¶53.    But on appeal, the Supreme Court found it was speculative.  *Id*.  Quoting this Court, it determined the "testimony was scientifically unfounded," since an expert "cannot look at a bullet wound and tell whether it was made by a bullet fired by one person pulling the trigger or by two persons pulling the trigger simultaneously."  *Id*.

¶54.    "While [the expert] is qualified to proffer expert opinions in forensic pathology, a

---

Nevertheless, in its response the State pointed out that Howard's report was attached to his petition for interlocutory review, docketed at 2021-M-00771-SCT.  We can therefore take judicial notice of the report since it appears on the docket of the Supreme Court.  *See Badger v. State*, 290 So. 3d 377, 381 (¶14) (Miss. Ct. App. 2020) (collecting cases acknowledging that this Court can take judicial notice of a filings on a docket).

court should not give such an expert carte blanche to proffer any opinion he chooses," the Court reasoned. *Id*. at (¶8). "There was no showing that [his] testimony was based, not on opinion or speculation, but rather on scientific methods and procedures." *Id*. As a result, it was error to allow the expert to testify. *Id*.

¶55.    We find the reasoning of the Supreme Court in *Edmonds* instructive. Like in that case, the proffered expert here did have qualifications in a field of expertise, namely in guns and their construction and firing. But just as in that case, qualification in one field does not mean qualification in another. The expert in *Edmonds* wandered afield of what was relevant and reliable, constructing a scenario to speculate two people were involved in positioning and firing a gun. Just as that expert did, here Howard concocted an untested and unreliable conclusion that the pistol could have been fired twice in quick succession—not at a gun range, but by a person shooting themself in the head in an act of self-harm. *Compare id.* at 792 (¶9) (where the "two-shooter testimony impermissibly (because it was not empirically proven) bolstered the State's theory of the case that [the defendant's sister] helped [the defendant] to fire the gun").

¶56.    This was beyond the realm of Howard's qualifications and, as in *Edmonds*, was too speculative. The defendant's retained expert could not merely test the trigger pull of a pistol and then opine that a person shot in the head could have pulled the trigger in quick succession. To reach that conclusion would require wading in the waters of medical testimony, which the witness was not qualified to do. Indeed, the actual expert medical testimony in the case, from the forensic pathologist, found such a theory impossible: the

13

forensic pathologist testified that either of the shots "would be classified as instantly incapacitating [to the victim] and basically instantly lethal." For this reason the trial court correctly ruled that Howard should not be allowed to testify regarding matters that were outside of his qualifications and not reliable.[2]

¶57. Yet as pointed out above, Howard should not have been completely excluded from testifying as an expert. His testing methodology as to firearms was relevant and reliable, and the State's own ballistics expert reached the same conclusion as to the weight of the trigger pull. The proper route would have been to simply limit Howard's proposed testimony on any medical or factual conclusions outside the realm of his qualifications in the realm of gunsmithing. It was therefore error to wholly exclude the expert instead of limiting his testimony to that realm in which he is qualified.[3]

---

[2] This is not the first time that Howard has been excluded for overreaching. *See People v. George*, No. 335641, 2018 WL 3244122, at *6 (Mich. Ct. App. July 3, 2018). In that case the Court of Appeals of Michigan affirmed a trial court's partial exclusion of Howard's testimony due to "his false syllogism in his report on the likelihood of the defendant's guilt." *Id.* The Michigan court approved the ruling that determined "the opinions in the report to be based on conclusions that were not reached through reliable principles and methodology," since the trial courts of that state, like ours, have the "obligation to ensure that any expert opinion testimony admitted at trial is reliable." *Id.*

[3] In addition to the problem of speculation, the State takes issue that Howard could not recall the names of the investigation manuals that he used in his report. But simply "failing to recall certain articles in a scientific field cannot be uncommon." *Clark v. State*, 315 So. 3d 987, 997 (¶21) (Miss. 2021). If an expert does not remember the basis in literature for an opinion, "[t]his is what cross-examination of an expert witness is all about." *Id.*

Likewise, the State protests that Howard's gun research was not peer-reviewed or published. But not all expert testimony is subject to publication; this is why the Supreme Court has concluded the lack of peer review is "simply not enough to exclude expert testimony." *Poole v. Avara*, 908 So. 2d 716, 724 (¶17) (Miss. 2005). Rather, "[p]eer review

14

¶58. Yet not all errors require reversal. "An error is considered harmless when the weight of the evidence against [the defendant was] sufficient to outweigh the harm done by allowing admission of the evidence." *Bays v. State*, 344 So. 3d 303, 307 (¶12) (Miss. Ct. App. 2022) (internal quotation marks omitted). A "[h]armless-error analysis prevents setting aside convictions for small errors or defects that have little, if any, likelihood of having changed the result of the trial." *Croft v. State*, 283 So. 3d 1, 11 (¶34) (Miss. 2019) (internal quotation marks omitted). And "[w]e do not reverse a conviction for an erroneous evidentiary ruling unless the error adversely affects a substantial right of a party, or in other words, unless the ruling prejudiced the accused." *Id.* (internal quotation marks omitted). So, "where it is clear beyond a reasonable doubt that the error did not contribute to the verdict, we need not reverse the conviction." *Id.* (internal quotation marks omitted).

¶59. We find that the error in excluding Howard as an expert witness was harmless. The core finding of Howard was that the pistol had a light trigger pull, which he determined was 2.25 pounds. The State's expert reached the same conclusion. Therefore the defendant was not deprived of the reliable and factual basis for his opinion that the handgun in question had a 2.25 pound trigger pull.

¶60. This determination is supported further because of the other testimony regarding Smith's actions. Eyewitness Elizabeth Bowlin testified she saw Smith shoot the victim twice

---

by publication remains only one factor on a non-exhaustive list of factors for admissibility under evidence rules with a liberal thrust." *Id.* While it is "helpful when present, publication and peer review are not absolutely required; their absence does not constitute automatic inadmissibility." *Id.* Instead, "[v]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." *Id.* (quoting *Daubert*, 509 U.S. at 596).

15

in the head. Investigator Earls also testified that Smith took him directly to the location of the gun, which was found underneath a portable building where Smith had previously hidden it after the night the victim was shot.

¶61. Therefore the exclusion of the expert did not prejudice Smith to the extent it requires a new trial.

## II. The verdict was not against the weight of the evidence.

¶62. Smith argues the jury verdict was contrary to the weight of the evidence because Elizabeth's testimony was "duplicitous," "unreasonable, inconsistent, self-contradictory, and unreliable." Specifically, Smith contends that Elizabeth's actions—taking her child to a known drug addict's house and staying with Smith after he murdered John—means that she lacked credibility.

¶63. "A jury verdict on appeal will be disturbed only when it is so contrary to the overwhelming weight of the evidence that to allow it to stand would sanction an unconscionable injustice." *Dehart v. State*, 290 So. 3d 373, 376 (¶16) (Miss. Ct. App. 2020) (internal quotation marks omitted). "The evidence is viewed in the light most favorable to the verdict." *Id*. And "[a]s an appellate court, we are not permitted to sit as the thirteenth juror and assume the role of juror on appeal." *Green v. State*, 312 So. 3d 1214, 1218 (¶18) (Miss. Ct. App. 2021).

¶64. The evidence of murder in this case rested in part on Elizabeth's testimony, which was that she saw Smith twice shoot the victim in the head with a .22 pistol. But the jury also heard the heated cross of Elizabeth by Smith's defense counsel, who hammered the witness

16

about her decision to go to the victim's house in the first place and to take her young child with her, casting doubt on her testimony that she was not using drugs given their presence in the home, and queried why she didn't just leave Smith behind after the shocking murder she said she witnessed. Defense counsel exposed inconsistencies in her testimony and pressed hard to her client's advantage.

¶65. In our system of justice it is the role of the jury to determine truth. The jury heard the inconsistencies in Elizabeth's testimony and were instructed in accord with precedent that "issues of weight and credibility of witness testimony are within the sole province of the jury as fact finder." *Id*. It is not our role to weigh Elizabeth's testimony, but that of the jury. It rejected the defense's theories and agreed unanimously that Smith committed murder. We find that upholding the conviction given this level of proof does not "sanction an unconscionable injustice." *Dehart*, 290 So. 3d at 376 (¶16).

## CONCLUSION

¶66. While it was error to wholly exclude the defense expert from testifying, it was harmless. The trial court correctly excluded the expert from testifying to matters outside his areas of qualification, and the jury still heard that the trigger pull on the pistol was 2.25 pounds, the same conclusion reached by the excluded expert. Nor was the verdict against the overwhelming weight of the evidence.

¶67. **AFFIRMED.**

**BARNES, C.J., CARLTON, P.J., GREENLEE, WESTBROOKS, McDONALD, LAWRENCE AND SMITH, JJ., CONCUR. WILSON, P.J., AND EMFINGER, J., CONCUR IN PART AND IN THE RESULT WITHOUT SEPARATE WRITTEN OPINION.**

17